Filed 10/18/21  In re J.S. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re J.S., et al., Persons Coming Under the Juvenile Court Law. | B310457 <br><br> (Los Angeles County Super. Ct. No. CK74786B-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> C.B. et al., <br><br> Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Brett Bianco, Judge.  Conditionally affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant C.B.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant R.S.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

C.B. (Mother) and R.S., Sr. (Father) appeal juvenile court orders concerning three of their children: J.S., D.S., and S.S. (collectively, the Minors). We are asked to decide whether the juvenile court abused its discretion in denying Mother and Father's petitions seeking additional reunification services even though, in the years since the Minors were removed from their care due to substance abuse, they relapsed several times. We also consider whether the appellate record shows there was full compliance with the Indian Child Welfare Act (ICWA) and related provisions of California law, particularly in light of our disposition of a prior appeal requiring further inquiry into ICWA issues.

## I. BACKGROUND

### A. *Overview of Dependency Proceedings Through This Court's Resolution of a Prior Appeal*

Mother and Father have four children together: J.S. (born in 2011), D.S. (born in 2013), S.S. (born in 2015), and R.S., Jr. (born in 2016). Mother's fifth child, J.D. (born in 2007), has a different father. This appeal concerns only the Minors (J.S., D.S., and S.S.).

In November 2014, the Los Angeles County Department of Children and Family Services (the Department) received a referral alleging Mother and Father use drugs, their home was unsanitary and lacked utilities, and the children were "filthy" and begged neighbors for food. The Department filed a petition alleging J.S. and D.S. were at substantial risk of suffering physical harm attributable to Mother and Father's substance abuse (cocaine), which rendered them incapable of providing regular care for the children.

3

The juvenile court removed J.S. and D.S. from Mother and Father's custody. When S.S. was born a few months later, the Department filed a petition based on the same allegations of substance abuse. S.S. was also detained.

At a combined jurisdiction and disposition hearing in December 2015, the juvenile court assumed jurisdiction over the Minors and ordered family reunification services. Mother and Father's case plans included drug and alcohol treatment with weekly testing, individual counseling, parenting classes, and monitored visitation.

Prior to a status review hearing in January 2017, the Department reported Mother tested positive for cocaine and opiates once in July 2016, but she and Father had otherwise tested negative. Both parents had been terminated from a drug and alcohol treatment program, however, for failing to actively participate in treatment. Visitation by the parents with the Minors was inconsistent, and the parents were not forthcoming with the Department regarding Mother's recent arrest for petty theft and Father's recent arrest for domestic violence.

The juvenile court found Mother and Father to be in "moderate" compliance with their case plans. The juvenile court further found the Department had not provided reasonable services to the parents and ordered further reunification services.

Prior to another status review hearing in October 2017, the Department reported Mother missed several drug tests and tested positive for hydrocodone in April 2017. Father tested positive for cocaine five times between February 2017 and May 2017 and again in October 2017. Mother was arrested twice in 2017, including an arrest for assault with a firearm, and Father was arrested four times, including an arrest for robbery. Both

4

parents were participating in a substance abuse treatment program, but the Department emphasized this was the third program in which they had enrolled within the last year. Visitation remained inconsistent. The juvenile court terminated reunification services and set the matter for a Welfare and Institutions Code section 366.26 permanency planning hearing.[1]

The Department later reported Mother and Father successfully completed an outpatient program addressing drug and alcohol abuse, parenting skills, and domestic violence. During treatment, however, Mother tested positive for cocaine and opiates and Father tested positive for cocaine.[2] The Department recommended a permanent plan of legal guardianship with T.W., a non-relative extended family member with whom the Minors had been placed for more than two years. The juvenile court appointed T.W. the Minors' legal guardian and granted Mother and Father monitored visitation.

Mother and Father appealed the section 366.26 orders, contending, among other things, the Department did not satisfy its duty of inquiry under ICWA and related California law. As we shall later discuss in more detail, this court conditionally affirmed the juvenile court's orders and remanded to permit the juvenile court to consider additional evidence of ICWA compliance or, if none existed, to order further inquiry. (*In re R.S.* (Dec. 19, 2018, B290032, B290033) [nonpub. opn.] (*R.S. I*).)

---

[1]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

[2]     Mother and Father submitted to drug testing through their treatment program as well as an outside laboratory. All of the positive results were reported by the outside laboratory. Both parents denied ever using cocaine.

5

### B. *Proceedings on Remand Leading to This Appeal*

In April 2019, the juvenile court reinstated jurisdiction over the Minors to address ICWA compliance.[3] In late 2019, the legal guardian and Father filed opposing section 388 petitions: T.W. sought to change the Minors' permanent plan from legal guardianship to adoption and Father sought further reunification services.

The Department initially recommended the juvenile court grant T.W.'s petition because the Minors were doing well in T.W.'s care and stated they wanted "Mama T." to adopt them. A few months later, based on Mother and Father's enrollment in individual counseling, negative drug tests, and successful visitation, the Department recommended reinstating reunification services contingent upon Mother and Father submitting to regular drug testing and services.

In February 2020, the juvenile court denied Father's section 388 petition, granted T.W.'s petition, and set another section 366.26 hearing.[4] In May 2020, the Department reported Mother and Father were visiting the Minors on a regular basis and the Minors looked forward to the visits. J.S. and D.S. indicated they wanted to remain living with T.W., however, which is where they had been placed since 2015. S.S. was too

---

[3] On the same date, Father filed section 388 petitions seeking reinstatement of his parental rights and reunification services. The juvenile court summarily denied the petitions.

[4] Mother and Father filed notices of appeal from these orders, which this court deemed notices of intent to file petitions for extraordinary writ. No petitions were filed, and we subsequently dismissed the appeals.

6

young to make a meaningful statement about where she wanted to live. The Department recommended the Minors remain placed with T.W. and the juvenile court set a date to finalize adoption.

In November 2020, the Department reported the Minors "usually shrug or say 'I don't know'" when asked whether they wanted to continue visiting Mother and Father but appeared excited when Mother and Father arrived for visits. The Department's recommendations were unchanged.

The following month, Mother and Father filed section 388 petitions requesting further reunification services (it is these petitions that are the subject of this appeal). They argued their circumstances had changed because, among other things, they completed six months of clean drug tests, consistently visited the Minors, obtained adequate housing, and had a steady income. Mother and Father argued granting additional reunification services would be in the Minors' best interest because "[i]t is better for children to have [two] parents," T.W. had other children in her home, and Mother and Father were uniquely aware of potential hereditary health issues. The juvenile court set a hearing on the petitions.

Prior to the combined section 388 and section 366.26 hearing in February 2021, the Department submitted a report recommending the juvenile court deny the parents' section 388 petitions, terminate their parental rights, and "move forward with adoption." Between January and July 2020, Mother and Father failed to appear for several drug tests. In May 2020, Mother tested positive for cocaine twice and Father tested positive for cocaine once. The Department had also been "made aware" of a video in which Father appeared to smoke marijuana. The Minors continued to enjoy regular visits with Mother and

7

Father, but the Department noted J.S. and D.S. gave "indifferent" responses when asked whether they wanted to continue the visits. (S.S., by contrast, stated she "ha[s] fun" with Mother and Father during visits.) The Department emphasized D.S. and S.S. "have only ever[ ] truly lived in the home of [T.W.] while [J.S.] was raised in the home of [Father] and [Mother] for her first few years of life."

The juvenile court denied Mother and Father's section 388 petitions, finding both a lack of changed circumstances and that further reunification efforts would not be in the best interest of the Minors. The juvenile court emphasized that although Mother and Father had obtained adequate housing and "some stability and employment as well," these facts were "something of a red herring because the issue here . . . was substance abuse." The parents demonstrated "paper compliance" with their case plans, "but clearly not much was learned especially since we would expect at this point parents to be really fighting and doing remarkably well if they really were serious about having a 388 granted. [¶] And yet we still see substance use by both Mother and Father at a time when they know the Department's going to be scrutinizing all their moves to see if they are truly serious."

Both Mother and Father addressed the juvenile court during the section 366.26 hearing and requested another chance to reunify with the Minors. In addition to highlighting their changed living situation, they suggested the Department fabricated their positive drug tests. The juvenile court acknowledged "[t]here is always a side—just the human side of the court that, of course, would love to give people more chances because we're all deserving of more chances and to correct past mistakes. But in dependency proceedings, the focus is always on

8

the permanency and stability for the children.  And this case has been around for a very, very long time.  There is no more time left under the law for further chances."  The juvenile court found the Minors to be adoptable, found no exceptions to adoption applied, and terminated Mother and Father's parental rights.

## II.  DISCUSSION

Mother and Father[5] contend the juvenile court abused its discretion in denying their changed circumstances petitions and, in any case, the section 366.26 orders should be reversed because the Department did not informally contact the Indian tribes to which it sent formal ICWA notice.  Neither argument has merit.

Mother and Father's most recent period of sobriety did not demonstrate changed circumstances in light of their history of relapse.  Moreover, it was within the juvenile court's discretion to conclude adoption by the caregiver with whom the Minors have spent most of their lives is in their best interest.  As for the ICWA contentions, the purpose of pre-notice communication between the Department and Indian tribes is primarily to determine whether formal notice is necessary.  Because the Department actually sent ICWA notices to the relevant tribes and there is no indication the notices were deficient in a manner that would have been remedied by such pre-notice contact, any error in failing to make pre-notice contact was harmless.

---

[5]     Father joins Mother's arguments.  Apart from suggesting specific questions the Department should have discussed with the relevant Indian tribes as part of its pre-notice ICWA inquiry— which we shall address—he does not present any separate issues on appeal.

9

There is, on the other hand, no documentation in the appellate record of efforts by the Department to contact two of the three relatives we previously held it should attempt to contact as part of an adequate ICWA inquiry. Thus, and similar to our disposition of the previous appeal, we will conditionally affirm the juvenile court's section 366.26 orders and remand for the juvenile court to ensure the Department has correctly documented compliance with its inquiry and notice obligations under ICWA and related California law.

### A. Denial of Mother and Father's Section 388 Petitions Was Not an Abuse of Discretion

A section 388 petitioner "has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*).) We review the juvenile court's denial of a section 388 petition for abuse of discretion. (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478-479; *In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

As a preliminary matter, Mother's contention that the juvenile court's remark that there was "no more time left . . . for further chances" indicates it did not recognize the scope of its discretion to grant the section 388 petitions is baseless. In context, however, these remarks merely summarize the consequences of the juvenile court's finding that Mother and Father did not satisfy their burden under section 388. The juvenile court held a hearing on the petitions and expressly found that circumstances had not changed and further reunification efforts would not be in the best interest of the Minors. As we

10

shall explain, that conclusion was within the juvenile court's discretion to draw.

### 1. *Changed circumstances*

A change in circumstances warranting the reinstatement of reunification services must be "substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) Changing—as opposed to changed—circumstances will not suffice. (*Mickel O., supra*, 197 Cal.App.4th at 615, citing *In re Casey D.* (1999) 70 Cal.App.4th 38, 47, disapproved on another ground in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5 (*Caden C.*).)

Mother and Father contend they demonstrated changed circumstances because they were no longer "living the lifestyle of a drug addict." They emphasize their improved housing and career stability and they argue positive tests in May 2020 do not undermine their showing that they were "free from drug addiction."

In our view, the positive tests in May 2020 were not isolated events. In addition to missed drug tests throughout the dependency proceedings, Mother tested positive for cocaine and opiates in July 2016, hydrocodone in April 2017, cocaine in October and November 2017, opiates in February 2018, and cocaine in May 2020. Father tested positive for cocaine several times in 2017, again in February 2018, and again in May 2020. These positive drug tests coincided with Mother's pregnancy with the Minors' younger sibling and the parents' participation in at least one of several treatment programs. The fact that Mother and Father were able to improve their living situation and have successful monitored visits with the Minors despite fairly recent

drug use does not demonstrate they addressed the substance abuse issues that gave rise to jurisdiction.

Mother's counterargument relies on *In re J.M.* (2020) 50 Cal.App.5th 833 (*J.M.*), a case in which the petitioner "ameliorated all concerns leading to dependency court jurisdiction" by avoiding contact with her abusive former partner for more than a year. (*Id.* at 837, 846.) The petitioner in *J.M.* prevailed notwithstanding her violation of a no-contact order as to her abuser on only one occasion (*id.* at 840-841), but that circumstance is not comparable to Mother and Father's repeated cycles of recovery and relapse here. The juvenile court could reasonably conclude nine months of sobriety (at best) following several years of recurring drug use under the scrutiny of the Department and treatment programs demonstrated changing—but not changed—circumstances. (*In re Clifton B.* (2000) 81 Cal.App.4th 415, 423-424 (*Clifton B.*) [holding seven months of sobriety insufficient to demonstrate changed circumstances where petitioner's lengthy history of drug abuse included "periods of sobriety alternated with recurring drug use"]; see also *In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686 [affirming denial of section 388 petition where the petitioner "had been clean for 372 days, [but] she had previously relapsed twice during the course of th[e] case"] (*Amber M.*).)

### 2. *Best interest*

Even assuming Mother and Father refrained from substance abuse between May 2020 and February 2021 and this was sufficient to demonstrate changed circumstances, they still did not carry their burden to demonstrate further reunification services would be in the Minors' best interest. In making this

12

determination, courts consider "the seriousness of the problem leading to the dependency and the reason for its continuation; the strength of the parent-child and child-caretaker bonds and the time the child has been in the system; and the nature of the change of circumstance, the ease by which it could be achieved, and the reason it did not occur sooner." (*Amber M.*, *supra*, 103 Cal.App.4th at 685.)

The first and third factors do not support Mother and Father's position. Mother and Father's drug abuse came to the attention of the Department due to reports that they were seriously neglecting J.S. (then three years old) and D.S. (then one year old). (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219 [highlighting the special problem of substance abuse in relation to children of "'tender years'"].) As courts have recognized—and this case demonstrates—chronic substance abuse is not easily addressed. (*Clifton B.*, *supra*, 81 Cal.App.4th at 423 ["relapses are all too common for a recovering drug user"].) Mother emphasizes she had a traumatic childhood and suffered several health crises during the dependency proceedings to explain her delay in addressing her drug abuse. These hardships do not meaningfully distinguish the latest period of sobriety from earlier, unsuccessful efforts at recovery.

The relative strength of the Minors' bonds to T.W. and their parents also weighs against further reunification services. Although "the bond to the caretaker cannot be dispositive . . . , lest it create its own self-fulfilling prophecy, . . . the disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531.) Here, the Minors

13

have been placed with T.W. since 2015—the majority of J.S. and D.S.'s lives, and nearly all of S.S.'s life—and referred to her as "Mama T."  By all accounts, they were thriving in her care.  J.S. and D.S. wanted T.W. to adopt them, and S.S. was too young to express a preference.  Although J.S. and D.S.'s stated indifference to continued visits with Mother and Father was tempered by their anticipation and enjoyment of visits, it was within the juvenile court's discretion to conclude the Minors' interests were best served by ensuring permanency and stability with T.W.

> B.    *Conditional Affirmance Is Appropriate Because the Record Does Not Show the Department Undertook Necessary ICWA Inquiry*
> 1.    *Additional background*

Father notified the Department early in dependency proceedings that he may have Cherokee or Seminole ancestry.  In late 2016, the Department sent ICWA notices to the Cherokee Nation, the Eastern Band of Cherokee Indians, the United Keetoowah Band of Cherokee Indians in Oklahoma, the Seminole Nation of Oklahoma, the Seminole Tribe of Florida, the Bureau of Indian Affairs, and the U.S. Department of the Interior.  As discussed in this court's opinion conditionally affirming the juvenile court's April 2018 section 366.26 orders, these ICWA notice forms provided scant information regarding Father's family.  (*R.S. I*, *supra*, B290032, B290033.)  Among other things, the forms did not include the addresses or places of birth of the Minors' paternal grandparents, the date and place of death of a paternal great grandmother, and the birthdate and tribal affiliation of a paternal great grandfather.  (*Ibid.*)

14

This court concluded there was no substantial evidence to support a finding that the Department adequately investigated Father's potential Indian ancestry. (*R.S. I*, *supra*, B290032, B290033.) There was no documentation suggesting the Department asked Father if he knew of other family members who might possess relevant information. (*Ibid.*) Moreover, although Department social workers spoke with the Minors' paternal grandparents and a paternal great aunt while investigating the allegations against Mother and Father and assessing placement options, there was no indication the Department asked these relatives whether they possessed information relevant to the ICWA inquiry. (*Ibid.*) Our opinion did not identify these relatives by name, but the Department's records reflect that social workers were in contact with Rory S. (the paternal grandfather), Charlene B. (the paternal grandmother), and Kimberly F. (a paternal great aunt) in 2015.

Recognizing that the Department may have discharged its duty of inquiry without providing documentation of its efforts, we remanded for the Department to submit any such documentation and, if none existed, for the juvenile court to order the Department to make the required inquiries. (*R.S. I*, *supra*, B290032, B290033.) We held that, "at a minimum," the Department must "exhaust Father's own knowledge of any Cherokee or Seminole ancestry" and make adequate efforts to interview paternal family members of which the Department was already aware "(such as paternal grandmother, grandfather, and great-aunt) or that Father is able to identify as possibly having pertinent information." (*Ibid.*)

On remand, the juvenile court found there was "no documentation . . . to demonstrate the Department undertook

15

meaningful inquiry in the beginning" and ordered the Department to further inquire as to the Minors' potential Indian ancestry. In January 2019, Father told a Department social worker that a paternal great aunt, Janette S.Z. (Janette), and paternal great grandmother, Emma Jean S. (Emma Jean), are registered members of the Seminole tribe. He further stated that his "[g]reat, great, great [g]randfather, John Horse," is on the cover of a book entitled Black Indians. Father's older daughter, Meshawn S. (Meshawn), told the social worker that both Emma Jean and her husband, John S., were "associated with" the Seminole tribe, and suggested the Department contact her aunts Janette and Sadee H. (Sadee) for more information.

The Department was unable to find contact information for Sadee, but a social worker spoke with Janette in February 2019. Janette told the social worker she is estranged from Father and "did not want to be involved [ ]or assist in any way." Nonetheless, Janette confirmed she is a member of the Seminole Nation. She did not have her tribal registration number with her, and she declined a follow-up call with the social worker. Janette could not identify any other relatives who might be able to provide additional information, but stated the Minors are descended from Chief John Moon of the Seminole tribe and named Irma Jones S., Sharna L.J., and John J. as others in this lineage.[6]

---

[6] According to the social worker's notes, Janette stated Father is the "son of Rorrick S., husband of Irma Jones S. (sister), daughter of Sharna L.J., daughter of John J., son of Chief John Moon of the Seminole tribe." The family tree suggested in these notes, which identify Irma Jones S. as the Minors' paternal grandmother, conflicts with the Department's records identifying Charlene B. as the paternal grandmother. Indeed, Father

16

Rory S., the paternal grandfather, told a Department social worker the Minors' great great great great grandfather was named John Bear Blackfoot, but Janette "is the only other member of the family that he knows that has knowledge of [the] family's Indian heritage." The paternal grandfather ended the call abruptly because he was at work and did not answer follow-up calls and a text message.

Although the Department's records commendably reflect multiple attempts to reach the Minors' paternal great grandmother, Emma Jean, by phone, there is no record of any follow-up with the Minors' paternal grandmother, Charlene B. (Notes summarizing the Department's efforts to contact Emma Jean mistakenly describe her as the paternal grandmother.) There is also no mention of further attempts to contact Kimberly F., the paternal great aunt mentioned in our earlier opinion.

The Department sent ICWA notices to the Seminole Tribe of Florida, the Seminole Nation of Oklahoma, the Choctaw Nation of Oklahoma, the Mississippi Band of Choctaw Indians, the Jena Band of Choctaw Indians, and the Blackfeet Tribe of Montana in 2019.[7] The ICWA notices identify Charlene B. as the Minors' paternal grandmother, but form fields for her current and former addresses, birth date and place, and date and place of

___

identified Emma Jean (a name the Department listed as an alias of Irma Jones in its ICWA notices) as the Minors' paternal *great* grandmother. It appears the notes of the social worker's conversation with Janette misidentify Rorrick/Rory S., the *son* of Irma Jones/Emma Jean, as her husband.

[7] The Minors' potential Choctaw and Blackfeet ancestry is through Mother's adoptive family and is not at issue in this appeal.

17

death are completed with the notation "FATHER UNABLE TO PROVIDE." The notices identify Rory S. as the paternal grandfather and list his current address, but the remaining form fields all indicate "FATHER UNABLE TO PROVIDE." The only information provided for the paternal great grandmother, Erma Jean J. AKA Emma Jean S. AKA Irma Jones S., is her birthdate and the fact that she is "REGISTERED WITH THE SEMINOLE TRIBE." The only information provided for the paternal great grandfather, John S., is his date and place of birth and death.

Several form fields, including those relevant to whether any family members attended an Indian school, received medical treatment at an Indian health clinic, and "[o]ther relative information," mention that "Father's great, great, great grandfather is John Horse AKA John S[.] AKA John Moon AKA John Jefferson AKA John Caballo AKA Juan Cavallo AKA John Cowaya AKA Gopher John."[8] The "[o]ther relative information" section also mentions Janette and her Seminole affiliation (with fields for her address and date and place of birth indicating "[s]he refused to provide") and Sharna L.J. (with all related fields indicating "[f]amily unable to provide"). Although Janette indicated Sharna L.J. was Emma Jean's mother (making her the Minors' great great grandmother), the notices list her as a cousin. The notices do not mention the paternal great aunts Kimberly F. or Sadee.

Each of the noticed tribes responded that the Minors are not enrolled members or eligible for membership. Five of the six

---

[8]     The appellate record does not indicate the source of several of these aliases. Nor is it clear why the notices do not include the name John Bear Blackfoot, mentioned by the paternal grandfather, Rory S.

tribes responded by letter. A Department social worker obtained a response from the sixth tribe—the Seminole Nation of Oklahoma—by telephone.

At a September 25, 2019, progress hearing regarding ICWA notices, the Department represented it had complied with ICWA requirements. Counsel for the Minors and Mother submitted on the matter, and Father's attorney did not address the matter when invited to do so. The juvenile court found the Department satisfied ICWA's inquiry and notice requirements, citing "the Department's exhaustive efforts to inquire of all persons with potential information," and "reiterate[d] its previous findings that ICWA does not apply in this case."

### 2. *ICWA and related California statutes*

ICWA reflects a congressional determination to protect American Indian children[9] and to promote the stability and security of Indian tribes and families. (25 U.S.C. § 1902; *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8 (*Isaiah W.*).) "The minimum standards established by ICWA include the requirement of notice to Indian tribes in any involuntary proceeding in state court to place a child in foster care or to terminate parental rights 'where the court knows or has reason to know that an Indian child is involved.' (25 U.S.C. § 1912(a).)" (*Isaiah W.*, *supra*, at 8 [explaining that ICWA's notice requirement enables tribes to

---

[9]     For purposes of ICWA and related state statutes, an Indian child is an unmarried person under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4); § 224.1, subd. (a) [adopting federal definitions].)

19

determine whether the proceedings involve an Indian child and, if so, "to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding"].)

"ICWA itself does not impose a duty on courts or child welfare agencies to inquire as to whether a child in a dependency proceeding is an Indian child." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 883.) Federal regulations implementing ICWA, however, require state courts to ask each participant in child custody proceedings whether they know or have reason to know that the child is an Indian child and to instruct the participants to inform the court if they if they subsequently receive information that provides reason to know the child is an Indian child. (25 C.F.R. § 23.107(a).) Additionally, pursuant to ICWA's provision that states may provide "a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under" ICWA (25 U.S.C. § 1921), California statutory law "incorporates and enhances ICWA's requirements." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 650 (*Breanna S.*), disapproved on another ground in *Caden C.*, *supra*, 11 Cal.5th at 629.)

At the time that the juvenile court terminated Mother and Father's parental rights, requirements regarding inquiry into whether a child is an Indian child were enumerated in section 224.2.[10] The statute requires a child services agency to, among

---

[10] Amendments to section 224.2 took effect on January 1, 2020 (Stats. 2019, ch. 434, § 2) and September 18, 2020 (Stats. 2020, ch. 104, § 15). Although the juvenile court determined ICWA did not apply in September 2019, the juvenile court has "affirmative and continuing duty" to ensure ICWA compliance (§ 224.2, subd. (a)) and we apply the law in effect when the juvenile court made the order from which the parents appeal.

other things, "[c]ontact[ ] the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(C).) Contact with a tribe pursuant to section 224.2, subdivision (e)(2)(C) "shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under [ICWA]" and "shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C).)

The sharing of information with tribes at this inquiry stage is distinct from formal ICWA notice to tribes. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1049 (*D.S.*).) Formal notice must include, among other things, biographical information regarding the child and their parents, grandparents, and great grandparents. (§ 224.3, subd. (a)(5).) The noticed tribes' determinations of whether the child is a member, or eligible for membership, are conclusive. (§ 224.2, subd. (h); *In re T.G.* (2020) 58 Cal.App.5th 275, 294.)

We review challenges to the juvenile court's findings regarding ICWA inquiries for substantial evidence. (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467.) Although failure to comply with ICWA's notice requirements ordinarily constitutes prejudicial error, violations of state statutes imposing higher

---

(See *In re A.M.* (2020) 47 Cal.App.5th 303, 320 ["The determinative factor is not when the ICWA-030 notices were mailed to the relevant tribes, but when the section 366.26 hearing was held" because the "termination order 'necessarily subsume[s] a present determination' of ICWA's applicability"].)

inquiry and notice standards will be held harmless unless the appellant demonstrates a reasonable probability of a different result. (*Breanna S.*, *supra*, 8 Cal.App.5th at 653; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1162.)

> 3. *Analysis*

Mother and Father contend the Department failed to discharge its duty of further inquiry because it did not make informal contact with the tribes before providing formal notice. Assuming without deciding the Department was required to make pre-notice contact with the tribes,[11] there is no basis to conclude pre-notice contact would have produced a different result.

Citing the paternal relatives' lack of cooperation with Department social workers, Mother contends informal contact with the tribes would have provided "another way to obtain the necessary information as to whether the proceedings involved an Indian child." In effect, Mother argues that if the Department had informally shared with the tribes the information that was ultimately included in the formal notice, the tribes might have provided additional information to include in the formal notice. The problem with this argument is that, with or without pre-notice contact, the tribes' membership determinations would be based on the same information. If, for example, a social worker had made a pre-notice phone call to the Seminole Tribe of Florida

---

[11]    In at least one case, the Court of Appeal has suggested formal notice satisfies the pre-notice contact requirement. (*In re D.F.* (2020) 55 Cal.App.5th 558, 570 [characterizing formal notice as "correspondence" sufficient to satisfy pre-notice contact provision in former section 224.2, subdivision (e)(3)].)

22

and learned Janette's tribal identification number, the only difference between the formal notice actually provided in this case and formal notice informed by pre-notice contact would be the addition of information already possessed by the tribe. Under these circumstances, there is no reasonable probability that pre-notice contact would have resulted in a finding that the Minors are Indian children.

Joining Mother's argument, Father suggests specific questions the Department might have posed to the Seminole Tribe of Florida in a pre-notice discussion: "(1) Is Aunt Janette a member? How does that affect the ability of her great-nieces and nephews to apply for membership? [¶] (2) Assuming . . . that [Father] is a direct descendant of Chief John Moon and that can be proven, are appellant and his children eligible for membership or is their blood quantum too dilute for membership or is there some other barrier, one that might be overcome, to obtaining membership in the tribe? [¶] (3) What are the basic criteria for membership in the tribe?" None of these questions would generate new information for the tribe to consider in determining whether the Minors are eligible for membership. As we have already said, the Seminole Tribe of Florida was issued a notice reflecting Janette's tribal membership and the Minors' purported descent from Chief John Moon. Father's questions are geared toward collecting information *from the tribe* regarding its reasons for concluding the Minors are not eligible for membership. But we do not second guess the tribes' conclusions. (§ 224.2, subd. (h).)

The Department's efforts to investigate the Minors' potential Indian ancestry were hampered by lack of cooperation from Father's family and, as we shall discuss, its failure to

contact all relatives who might possess pertinent information. But pre-notice contact with the tribes would have made no difference and any error in declining to make informal tribal contact was harmless.

Finding this particular asserted informal contact error harmless, on the other hand, does not mean that outright affirmance ought to be the result. The state of the record reveals another problem with the Department's inquiry that requires remediation.

In our previous opinion, we held that a meaningful ICWA inquiry must include efforts to interview Rory S. (the paternal grandfather), Charlene B. (the paternal grandmother), and Kimberly F. (a paternal great aunt), with whom the Department was already in contact. The record in this appeal reflects follow-up with Rory S., but no further attempts to interview Charlene B. or Kimberly F. Instead, the Department documented its contact with a different great aunt (Janette) and efforts to contact the Minors' great grandmother (Emma Jean), misidentified in a social worker's notes as their grandmother.

The Department's apparent failure to contact these relatives is reflected in the ICWA notices. For example, form fields for Charlene B.'s biographical information indicate "FATHER UNABLE TO PROVIDE." Although the Minors' purported Indian ancestry runs through Rory S. and Charlene B. may accordingly be unlikely to provide information beyond that already shared by Rory S. and Janette, the appellate record does not disclose whether Kimberly F. is the sister of Charlene B. or Rory S. If the latter, it is reasonably probable that Kimberly F. may possess information regarding her family's ancestry that Rory S. was unable (and Janette unwilling) to provide. For

24

example, it is reasonably probable that a sister of Rory S. would be able to provide contact information for her mother (the Minors' great grandmother), Emma Jean, who other relatives identified as a registered member of an Indian tribe, or Sadee, who another relative indicated might have more information about the Minors' Indian ancestry.

We are mindful of the fact that no relatives suggested Kimberly F. was likely to possess relevant information. But following up with a paternal relative with whom social workers were already in contact—and a person we specifically held the Department must make efforts to interview—does not amount to "cast[ing] about" for relevant information. (See *D.S.*, *supra*, 46 Cal.App.5th at 1053 ["The [child welfare agency] is not required to 'cast about' for information or pursue unproductive investigative leads"].)

Under the circumstances, we believe it is appropriate to conditionally affirm the section 366.26 parental rights termination order and remand to the juvenile court with directions. (*Breanna S.*, *supra*, 8 Cal.App.5th at 656; *In re Michael V.* (2016) 3 Cal.App.5th 225, 236; see also *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 788.) On remand, the juvenile court shall permit the Department to submit evidence of its attempts to interview the Minors' paternal grandmother, Charlene B., and paternal aunt, Kimberly F., regarding the Minors' potential Indian ancestry.

If additional evidence demonstrates the Department was unable to reach these relatives or they indicated they had no pertinent information before the Department sent ICWA notices to the relevant tribes, the juvenile court need only make a finding to that effect on the record or in a minute order. If, however,

there is no documentation demonstrating such an inquiry was undertaken by the Department, the juvenile court shall order the Department to conduct such an inquiry and to submit evidence of its efforts. If the Department's inquiry produces additional material information regarding the Minors' potential Indian ancestry, the Department must re-notice the pertinent tribe(s) with the additional information included in the notice. (If no additional material information is produced, re-noticing is not required.) Upon receipt of responses to any further ICWA notice that may be required, the juvenile court shall then determine whether ICWA-related inquiry and notice requirements have been satisfied and whether the Minors are Indian children. If the court finds the Minors are Indian children, the court shall vacate the parental rights termination orders and proceed in compliance with ICWA and related California law. If the court finds the Minors are not Indian children, the section 366.26 orders shall remain in effect.

DISPOSITION

The juvenile court's February 10, 2021, orders denying Mother and Father's section 388 petitions as to J.S., D.S., and S.S. are affirmed.  The juvenile court's February 10, 2021, section 366.26 parental rights termination orders as to J.S., D.S., and S.S. are conditionally affirmed.  The cause is remanded to the juvenile court for further proceedings consistent with this opinion.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


RUBIN, P. J.


MOOR, J.